# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| CASSEY BROWN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 6:15-cv-03468-NKL ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) |
| Defendant. | ) |

## ORDER

Cassey Brown appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits and supplemental security income.[1] The Commissioner's decision is affirmed.

**I. Background**

Brown was born in 1981 and is a high school graduate. In the last 15 years, she has worked as a cook at a grocery store deli and an assistant manager at convenience store, and in factories as a welder and sewer, and doing quality control. She has not worked since 2010. She claims disability due to obesity and degenerative disc disease of the lumbar spine, as well as fibromyalgia.

**A. Medical history**

Brown went to the emergency room for back pain in 2004. The next week, Dr. Douglas Green, a neurologist, surgically repaired discs in her lumbar spine.

In May 2008, Brown had a car accident, and went to an urgent care clinic complaining of

---

[1] Brown's claim was previously denied in December 2010. This Court reversed the decision in March 2013 and remanded without written order for further consideration. Brown's current appeal is from the decision rendered after remand.

back, hip, and leg pain. She returned two weeks later for pain, tingling, and numbness.

Brown saw a nurse practitioner, Celeste Bowles, in February and October 2010 for cough and back pain. NP Bowles prescribed pain medication for the back pain.

Brown saw Dr. Richard Bowles in early January 2011 for "recheck" of fibromyalgia and back pain. Brown reported a gradual onset of fibromyalgia pain. She said her back pain was long-term despite surgery, and that Tramadol had stopped helping. Dr. Bowles noted, "Pt now spoiling for breast reduction surgery." Tr. 250. Under Assessment and Plan, the doctor listed low back pain, and prescribed a course of Savella with no refill, and referred Brown to her neurosurgeon, Dr. Green. Dr. Bowles also listed HNP in the lumbar region, radiculopathy, and fibromyalgia, but did not identify any treatment plan. Tr. 251. Brown subsequently had an MRI of her back, which showed disc issues and degenerative changes. At the end of January 2011, Brown saw a nurse practitioner, David McVicker, for back pain. NP McVicker noted Brown's gait was abnormal. He diagnosed sciatica, herniated disc, and morbid obesity; prescribed pain medication; and noted Brown was scheduled to see Dr. Green.

Brown saw Dr. Green in February 2011. He observed lumbar tenderness on palpation, limited range of motion due to pain, and decreased strength and sensitivity to pinprick on the right. He recommended weight loss and referred Brown to a pain clinic, and instructed her to return if the conservative treatment did not work.

In April and June 2011, Dr. Thompson gave Brown spinal and epidural steroid injections for back pain. In June 2011, the doctor observed SI joint tenderness and a broad-based gait. Brown reported 100 percent decrease in pain with the injections, although she ultimately reported that the pain relief did not last.

Brown saw Dr. Green again in December 2011 for back and hip pain. The doctor noted

tenderness to palpation along the lumbar spine and SI joint, some difficulty with heel-gait testing on the right due to foot drop, and some decreased strength in the right hamstring. He recommended an MRI and advised Brown to follow up after testing was complete. However, Brown did not have the MRI because she became pregnant.

At fourteen appointments and checkups throughout Brown's pregnancy, the providers did not note reports of any pain, and on two other occasions, Brown reported pain of three or less on a 10-point pain scale. At a visit during her second trimester, Brown reported that the only pain she had was due to removal of her wisdom teeth the prior week. Tr. 684. Her baby was born in August 2012.

Brown saw Dr. Griffith in November 2012, reporting that her fibromyalgia medication was not working and requesting an MRI of her back. Dr. Griffith diagnosed lumbago and chronic fatigue syndrome. An MRI performed later that month showed nothing new.

In February 2013, Brown visited Cherry Health Center for back pain. An x-ray showed discogenic spondylosis in the lumbar region, articular facet degeneration, and restriction of lumbar motion. Later that year, in November 2013, Brown saw Dr. Stinson for neck and shoulder pain, and she reported fatigue and malaise. She denied gait disturbance, or weakness or numbness in her extremities. The doctor diagnosed cervical strain, myalgia, myositis, and obesity. At a July 2014 visit with Dr. Stinson, Brown complained of fatigue, problems sleeping, and left wrist pain, and demonstrated gait disturbance. She had normal leg strength. The doctor diagnosed wrist pain and lumbago.

B.   **Written opinion evidence**

NP McVicker completed a Medical Source Statement-Physical in April 2011. He opined, among other things, that Brown could frequently lift and carry 15 pounds; stand or walk

continuously for 45 minutes up to an hour throughout an eight-hour work day; sit continuously for 30 minutes up to an hour throughout an eight-hour work day; and needed to lie down two to three hours during a shift if she suffered pain.

A non-examining medical expert, Dr. Lee Beesen, opined in July 2011 that Brown suffered from lower back pain and fibromyalgia. He further opined, among other things, that Brown could occasionally lift and carry up to 20 pounds; sit two hours at a time without interruption and three hours during the work day; and stand or walk one hour at a time up to two hours during the work day.

Dr. Charles Ash, an orthopedist, saw Brown for a consultative exam in June 2014. He observed Brown was obese; had normal range of motion in the cervical spine and upper and lower extremities; had lumbar and sacroiliac tenderness with limited motion; and walked with somewhat of a limp. He noted, "There is a marked subjective component to the limp." Tr. 729. He diagnosed probable degenerative arthritis of the lumbar spine. He opined that Brown could stand and walk two hours in a workday; sit eight hours in a workday; and lift ten pounds occasionally and no weight frequently. He also completed a Medical Source Statement-Physical in which he further opined that Brown could occasionally lift and carry up to ten pounds; sit, stand, or walk one hour at one time without interruption; sit eight hours throughout an eight hour workday; and stand or walk four hours throughout an eight hour workday.

### C. The hearing of October 2014 before the ALJ

Brown testified that her back pain had worsened over time, and she had leg numbness and soreness. She said she could not sit for long periods, and that she had trouble sitting during the hearing. Standing, such as to do the dishes, could cause back pain. She was not using an assistive device to walk for purposes of the hearing, but said that around her house she used

walls and shelves to assist when she walked. She further testified that she had to recline or lie down for "ninety percent" of the day, Tr. 374, fell on occasion when her legs went numb, and on bad days could not move at all. She explained that she stopped working due to pain: "I'd go home crying, hurting so bad." Tr. 379. When asked where the pain was, Brown told the ALJ, "Mainly in my back." Tr. 380. She did not mention pain or other symptoms in relation to fibromyalgia, nor mention fibromyalgia, during her testimony.

Dr. Donald Plowman, a board-certified orthopedic surgeon who is familiar with the rules used for evaluating evidence and providing expert testimony in the Social Security context, examined the records and testified at the hearing. He opined that Brown's severe impairments included lumbar spine problems with a diagnosis of lumbar spondylosis, post disc incisions, and degenerative disc problems, as well as obesity. (Tr. at 358). He noted that pregnancy is expected to exacerbate back pain. Although a diagnosis of fibromyalgia was noted in places in the medical records, the doctor testified that he was unable to find any documentation of a proper work up for fibromyalgia that her doctor had done, and he did not conclude that fibromyalgia was a severe impairment. Dr. Plowman testified that Brown's limitations included lifting ten pounds frequently and twenty pounds occasionally; standing and walking thirty minutes at a time with rest periods for four hours during the day; sitting for six hours with a sit-stand option, alternating every thirty minutes; limited kneeling and crawling due to weight; and occasional driving. He agreed Brown might need work breaks.

**D.     The decision**

The ALJ determined Brown suffered from severe impairments of obesity and degenerative disc disease of the lumbar spine, and concluded she retained the RFC:

> [T]o perform light work as defined in 20 CFR 404.1567(a) and
> 416.967(b) except the individual could stand 30 minutes at a time

> up to four out of eight hours; could walk 30 minutes at a time up to four out of eight hours; could sit six out of eight hours; would need to have a sit/stand option every 30 minutes; could climb ramps and stairs very occasionally, less than an occasional basis; could occasionally crouch, occasionally stoop; is unable to kneel; unable to crawl; also is unable to climb ladders, ropes, and scaffolds; has no limits as far as reaching, handling, fingering, and feeling with the upper extremities; could occasionally push/pull or operate food pedals with the lower extremities not to exceed 20 pounds; should avoid concentrated exposure to extreme heat; should avoid all exposure to vibrating equipment, as well as should avoid exposure to unprotected heights; could drive and operate machinery on an occasional basis, but no driving as part of work.

Tr. 327. Relying on vocational expert testimony, the ALJ concluded Brown could not perform her past relevant work, but could perform work as a production assembler or small products assembler, jobs that existed in significant numbers in the national economy.

## II. Discussion

Brown argues the decision must be reversed because the ALJ failed to include fibromyalgia as a medically determinable condition at Step 2, and the credibility analysis is not supported by substantial evidence.

The reviewing court does not reweigh the evidence presented to the ALJ and will defer to the ALJ's determinations regarding questions of fact, including the credibility of a claimant's testimony, as long as those determinations are supported by good reasons and substantial evidence. *Cline v. Colvin,* 771 F.3d 1098, 1103 (8th Cir. 2014) (internal citations omitted). Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, then the court must affirm the ALJ's decision. *Chaney v. Colvin,* 812 F.3d 672, 676 (8th Cir. 2016).

### A. The credibility determination

The ALJ found Brown's complaints of back pain to be at least somewhat credible, and accommodated those complaints, to the extent he did find them credible, in formulating the RFC. But the symptoms Brown complained of were extreme, and the ALJ gave good reasons supported by substantial evidence for concluding the complaints were not entirely credible.

The ALJ noted the lack of objective evidence to support Brown's claims, which is an appropriate reason to discount credibility. See 20 C.F.R. §§ 404.1529(a), (b)(3) and 416.929(a), (b)(3) (addressing statements that are not consistent with medical and laboratory findings); *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (ALJ may disbelieve subjective reports due to inconsistencies). For example, Brown testified that she needs to spend 90 percent of her time reclining or lying down, due to pain. But nowhere in her medical records does any provider ever record such an extreme complaint. Even while pregnant, a condition that typically exacerbates back pain, Brown had over a dozen appointments at which she did not complain of pain, and the few times she did, she rated it at three on a pain scale, or attributed it to removal of her wisdom teeth. She has not visited an emergency room for pain since 2004 when she had acute back pain or an urgent care clinic since 2008 after having a car accident. When Brown saw Dr. Bowles in January 2011 for "recheck" of fibromyalgia and back pain, he noted she was "spoiling for breast reduction surgery."

In addition, the nature and frequency of Brown's treatment is disproportionate to the degree of pain she claimed. The treatment was conservative. Her providers recommended weight loss, prescribed pain medication from time to time, and once referred her to a pain clinic. She had injections in her back, which she reported completely resolved her pain for at least awhile. In February 2011, Brown saw Dr. Green, the neurologist who had performed her back

7

surgery in 2004, on referral from her primary care doctor. Dr. Green recommended conservative treatment and instructed her to follow up if that did not work, but Brown never returned to see him. Receiving conservative treatment and failing to seek follow-up treatment undermines a complaint of disabling pain. *See Kisling v. Chater,* 105 F.3d 1255, 1257 (8th Cir. 1997) (conservative treatment indicates symptoms are not as severe as claimed); *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (failure to seek regular and available medical treatment undermine a claim of disabling pain); SSR 96–7P, 1996 WL 374186, *7 (July 2, 1996) (noting that "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").

Furthermore, Brown's doctor recorded no significant complaints of pain during multiple prenatal visits in 2012; she saw a doctor about pain in February and November 2013, and did not see a doctor again until July 2013, eight months later. The limited frequency of complaints and large gaps between doctor visits also detracts from Brown's credibility. *Id.*

The physical findings are also consistent with the ALJ's determination. The ALJ observed Brown appeared to exaggerate her symptoms at the hearing, Tr. 331, a determination from which an ALJ is entitled to draw conclusions concerning credibility, *Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir. 2001). In addition, Dr. Ash noted a "marked subjective component" to Brown's limp when he examined her, and Brown did not consistently present to her providers with gait problems which, to the ALJ, raised the question whether she was exaggerating when she presented to Dr. Ash. Tests were unremarkable, such as a November 2012 MRI of her back that showed nothing new.

The ALJ also cited Brown's work history, which spans 1999 to 2010, and reflects low or

very low earnings in the 15-year period prior to the onset date.[2] Her earnings do not reflect that she consistently worked full-time. Such evidence supports a conclusion that her impairments were not the actual cause of absence from the work force. *See Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) (claimant not credible due in part to a sporadic work record and low or no earnings).

The foregoing demonstrates the ALJ's credibility determination was based on substantial evidence.

Brown's citations of opinion evidence fail to demonstrate otherwise. For example, Dr. Beesen opined that Brown is limited to three hours of sitting in an eight-hour work day, but the ALJ gave that part of the opinion little weight because Dr. Beesen did not explain it, and it is inconsistent with the medical evidence as a whole, including Brown's treatment history. NP McVicker is not an acceptable medical source. *See* 20 C.F.R. §§ 404.1527(c) and 416.927(c). In any event, NP McVicker's opinion was extreme and the ALJ gave it little weight because he saw Brown very little, the opinion is inconsistent with the treatment record, and Brown's treatment was conservative overall. Likewise, the ALJ gave significant weight only to the part of Dr. Ash's opinion that the doctor explained and was supported by the record, *e.g.,* that Brown could sit for six hours total, and that part does not support Brown's argument. Brown points out that Dr. Plowman agreed Brown might need work breaks. Assuming Brown did need them, the doctor did not testify to how many, nor to how long they should be, nor to when they should occur throughout the day.

Substantial evidence supports the ALJ's determination concerning Brown's credibility.

---

[2] From 1999 to 2010, Brown earned between $901 and $9,837 per year, except 2005 and 2007-2009, when she earned between $15,439 and $18,137 per year.

### B. Fibromyalgia

Brown argues that the ALJ failed to properly evaluate her fibromyalgia under Social Security Ruling 12-02p, which contains two variations of diagnostic criteria: the 1990 American College of Rheumatology (ACR) Criteria for the Classification of Fibromyalgia, and the 2010 ACR Preliminary Diagnostic Criteria. 2012 WL 3104869, *2. The SSR expressly provides that either may be used, and that the agency "may" find an individual has the condition if either is met. *Id.* at *3. Here, the ALJ referred to the lack of evidence of 11 out of 18 trigger points, which is part of the 1990 criteria, but not the 2010 criteria, which instead examines three elements. Brown concedes she does not meet the former, but argues she established the latter, and that the ALJ therefore should have included fibromyalgia at Step 2.

As noted, the SSR provides that the agency "may" find a claimant has fibromyalgia if the criteria are met; the SSR does not require such a finding. At core, the criteria are subject to a finding that the diagnosis is consistent with the record:

> We will find that a person has a [medically determinable impairment] of [fibromyalgia] if the physician diagnosed [fibromyalgia] and provides the evidence we describe in section II.A. or section II.B., <u>and the physician's diagnosis is not inconsistent with the other evidence in the person's case record</u>.

*Id.* (emphasis added).

Here, the diagnosis of fibromyalgia, while it appears in places in Brown's record, is not consistent with other evidence in the record. Dr. Plowman reviewed Brown's longitudinal medical record, and found support for the conclusion that she had severe impairments of degeneration of the lumbar spine and obesity, but not fibromyalgia. The doctor acknowledged Brown had been prescribed fibromyalgia medication, but testified he "did not find a thorough fibromyalgia evaluation checking tender points and documenting problems from fibromyalgia"

other than fatigue. Tr. 360. Brown points to no such evaluation in the record.

Even Brown's treating physicians did not agree she had fibromyalgia. For example, neither Dr. Griffith nor Dr. Stinson included a diagnosis of fibromyalgia after seeing Brown in 2012 and 2013, respectively.

Nor did Brown herself mention "fibromyalgia" when she testified at hearing, or attribute her symptoms to any impairment other than her back problems. When asked why she stopped working, Brown told the ALJ it was because of pain, "mainly in my back." Tr. 379-80.

The ALJ's conclusion that fibromyalgia is not a medically determinable impairment, as provided under SSR 12-02p, is supported by substantial evidence on the whole record.

In view of the foregoing, the Court will not address Brown's remaining arguments concerning the specific 2010 criteria.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: June 13, 2016
Jefferson City, Missouri